May it please the Court, I am Hugh Cadden, appearing on behalf of Petitioner-Appellant Andy Saberi. I hope to reserve two or three minutes for rebuttal, and I'll keep my eye on the clock. Your Honors, this is a case of first impression under the Commodity Exchange Act, specifically Section 4AE of the Act, which in pertinent part provides that it will be a violation of the Act for any person to violate a position-limited rule of an exchange if that rule has been approved by the Commission. And the order in this case found that Petitioner violated an exchange speculative limit provision and imposed a sanction of $110,000 civil monetary penalty, a 30-day trading prohibition on all exchanges, and a cease and desist order. In reaching its decision to find a violation, the Commission considered what we'll be discussing a first occurrence situation where the Petitioner exceeded the position limit. So the only thing in dispute here really is not whether he violated the rule, but the severity of the sanction. I would parse that a little bit and say that it's not an ‑‑ it is undisputed that he held the position in excess of the limit set forth in Rule 8302E. That is to say he violated the rule. Well, I think the issue comes down to what's a violation and how do you determine a violation under Rule 8302. So you're wanting to argue that he may not even have violated the rule, even though he held in excess of the rule's cap during the relevant period? I would argue one of the three reasons that I think the Commission erred, one is the first reason is that, in essence, in order to find a violation of 4AE, you have to have a violation of 8302E and Rule 443. What the Commission did is they looked only at 8302E, which simply states that no person shall own or control a position in excess of, and then it delineates all the particular circumstances relating to that speculative limit. There's no word in 8320E that says this is a violation. You have to read 8302E in conjunction with Rule 443, which is entitled Speculative and Hedge Position Limit Violation. I mean, you're saying that while the rule may be clear, if you read far enough, it's not obvious that you're supposed to read further? No. It's basically in order to find a violation, 4AE says a violation of an exchange set limit, and our position is, is that in order to determine a violation, to find that violation, you have to look at 8302E and 443. Now, the important aspect is, is that 443 states unequivocally that the first occurrence of exceeding the limit will result in a warning letter and will not be recorded as a violation. Not be recorded as a violation. Unfortunately, I'm having a hard time following your argument in the sense that 8302 sets the limits, and if you go over the limits, you can't erase that, can't unring that bell. Your client is over that limit at the prescribed time. That's correct. Okay. So you don't unring that bell. 4AE then says if you have a violation, it will be a violation of this chapter to violate any rule of contract markets. So if you violated, if you've now over the limit, you've violated a contract rule, so you've now made a violation according to 4AE. Well, it's our position. Well, wait a minute. Before you get to your position, are you saying at that moment, forget about 443, because you've got to chop this like a salami in a couple of pieces, okay? Correct. So the second slice is that you've got a violation as defined under 4AE. No? The second slice is to determine the violation, you look at 443. And 443 said. Now, wait a minute. What happened to 4AE? 4AE is the statute. In order to have a violation of the statute, you have to have a violation. Wait a minute. If you don't have a statute, you don't have a violation. I mean, you don't go to a regulation. A regulation is no good without a statute. A violation or a breach of the law is established by statutory authority. So if you have a 4AE, follow me just a second. If you've got an 8302E overage in your contract. Correct. And it says you can't do that. You should. You shall not. And then if 4AE says it will be a violation if you violate a rule, you now have a violation at that point. I would say that you have to look at 443, because 443 provides the violation. It sets. It provides for the remedy to the violation. It provides for the sanction for the violation. Correct. Okay. Well, don't you have to get a violation? Why would I go to a sanction statute before I went to see if I had a violation or not? Well, because that sanction statute also provides that if I exceed the limits again within 12 months, it's going to be considered a violation. First of all, you just told me that you didn't exceed anything. If you're going to eliminate 4AE and that negates 8302, you haven't violated anything, why would you worry about 443 at all? I don't see how you can get to the sanction before you figure out where the authority is that I've actually violated the law at all. Okay. That's our first argument, Your Honor, in terms of why we think that the order needs to be. What's your next best argument? The second argument in which if you accept the commission's construction that they can consider a first occurrence violation as a violation of the Act, I think you result in creating a situation where you've set up two standards. You've set up two standards, one of which you go under the exchange rule and you have basically a warning letter approach and no recorded violation, and then under the other scheme, you have a violation which is prosecuted by the administrative agency resulting in dire sanctions. So you've created basically a two-tier or two-track system when you accept that definition. And the result of that is a violation of an NASD regulation can result in civil penalties and can result in the NASD canceling the registration of the broker-dealer. Well, it can, Your Honor. I'm not disputing that. But you can't just arbitrarily have a situation where you're saying, okay, under one track, some people are going to be treated one way. Why not? The Federal Government can say we really think that a violation of the exchange rules is a sanctionable offense. The exchange may say the first time we'll just send you a letter, but that's up to them. But we're telling you that you violate an exchange rule, you're going to be sanctioned. I don't see anything inconsistent with that. Do you think it's unconstitutional? I do. I think it's not. What's the specific text of the Constitution at which you're pointing? Due process. I think that basically you have a situation right now. Notice? There is no. The third argument that I would submit is basically the lack of notice. What you have here in terms of our third argument is that you have a situation where the commission, through its rulemaking, has basically told the participants in the marketplace that this is what constitutes a violation, and these are the related penalties. Well, I think we've got a nomenclature problem here. It's the exchange that sets up 443. It seems to me that you've got two tracks working here. If you belong to the exchange. No, Your Honor, if I could just address that point. Is Rule 443 an exchange rule? It is, Your Honor, but let me explain the exchange, I mean, the regulatory framework, because this is critical to the analysis. In 1981, the Commodity Exchange Act, through a rulemaking, basically said we're going to pass this rule, it's 1.61, and from henceforth, all exchanges have to impose limits, submit limit rules, and submit enforcement rules. That's 1981. Up to 1981, limits were only done by the commission, and they were set on a handful of agricultural commodities, and they were enforced by the commission. Now, subsequent to 1981, or right about the same time, the commission amended or requested Congress to amend Section 4, and they came up with 4AE, so that they could enforce exchange limit violations. Now, those rules were approved by the commission, pursuant to the commission's rule review authority, and they became part of the exchange rulebook. And the commission basically has articulated at that time, and has continued to articulate, and it's part of the Commodity Exchange Act, that the exchanges have the primary responsibility for enforcing their rules, and that the commission will have oversight. So it's in that context that these rules have to be viewed. So we have a situation where the commission approved these rules. They became part of the exchange rulebook, and every trader or participant in the marketplace, the individual of average intelligence, is going to look to those rules and be bound by them. And the issue here in our third argument, which I think is a notice argument, and I referenced the Upton case, it's essentially everyone is operating out there with the idea that 8302e and 443 basically demonstrate what the violation, what the limit is, what the violation is, how it's going to be treated, and what the penalties are. And what we have here is basically the commission coming along and saying not to worry, just ignore 443. It's our interpretation that this has nothing to do with it. We can ignore it. And the consequences, I could live with that if there was some articulated criteria for making a determination. Well, maybe I'm missing something. 443 talks about a customer. Is your client a customer? Yes, it is. Yes, he is. And let's assume we follow this through and assume there was a violation and jump into 443, as you ask, you're arguing that you should have just got a warning letter. That's correct, Your Honor. It's not only that we should have gotten a warning letter, but if there are different consequences, we should have been, they should be adopted pursuant to notice, comment, and rulemaking. I understand your argument. You would claim you got a warning letter now. The commission did a little bit different to you, didn't they? They barred him from all markets, all speculative markets. So there's a whole different remedy. It seems as though your remedy under 443 as to the Chicago exchange is one letter, reprimand. It seems as though all markets, because he's a speculator for 10 years, was all markets. Now, there's a whole different standard there. He had two different things going. The Chicago exchange rule 443 doesn't apply to other exchanges, does it? Correct. Okay. So he's trading in the Chicago exchange. As a result of what he did in the Chicago exchange as a speculator, the commission said, we look at a lot of these commodity markets, and you're not going to trade in any of them. It's a whole different matter. So he could have got both ends. There's no discrimination in effect. He just can't do certain things in the Chicago market today, but he also, because of his trading, can't do it elsewhere. The Chicago exchange rule can't affect him in New York, can it? In my opinion, there is just one. Well, no, I'm just asking. Maybe I'm missing something here. The Chicago exchange rule 443 is going to apply to that Chicago exchange, not to any exchange in New York, Los Angeles, anywhere else.  Correct. But the commission went further in saying, I find a violation. You had, let's put it, you had an overage. Okay? Correct. 4A3 applies across the United States, right? Correct. Okay. So they apply it across the United States at the commission level. There is definitely discrimination here and an element of fundamental unfairness because it's being applied to the Petitioner as a customer, and it's, and the exchange member, the exchange member under 443 has the warning letter approved. The discrimination must come from 4A3, then. 4A. 443. No, no. The discrimination, if you're going to have discrimination because he was sanctioned on a nationwide basis, it's got to come from the statute, which is 4A. No, no. He basically is being prosecuted for this violation. He's a customer, a nonmember, when, in fact, the members are not prosecuted. They fall under 443. They're not prosecuted by the exchange, but they can be prosecuted by the Federal Government. De facto, they're not. In the record, it basically says that none of these situations has been referred to the exchange on behalf of a member, only customers. Are you arguing selective prosecution? Absolutely. Is that in your brief? Yes. It's basically, it's the unfair application. And you know the ordinary fate of selective prosecution arguments. Yes, I do, Your Honor. But even with selective. You usually lose. I don't dispute selective. You cannot have a selective prosecution that's predicated on an unfair predicate or that violates a constitutional element or due process. The fact of the matter is, and this was even in Mr. Wolf's testimony, that basically there's some sort of unwritten feeling, unarticulated feeling that, well, we can't do everything that we think we can do with respect to a customer because they're not a member. The reality of it is, is we have a dual system here that is terribly unfair. Members get a warning letter, and this customer not only gets the warning letter and gets told that we're not going to refer her to the Business Conduct Committee because we don't think it warrants a bar from the market, but then he gets prosecuted and he gets a penalty. And he gets these sanctions imposed in which, in the context of the sanctions, as we've argued in the briefs, that they're an abuse of discretion, compare the sanctions that result to the nonmember Petitioner against the sanctions that apply under 443. Kennedy, I think what your best argument is that the sanctions here are excessive because they found that he intentionally entered an order for more pork bellies after he was told that he was holding too many pork belly contracts. Now, isn't there a problem, a factual problem there that he was, in fact, told he was holding too many pork belly, but after he had entered his order for the 10 additional contracts? That's undisputed in the record. There's no question about that. And the real basis of the ruling, according to the transcript, is that he did this intentionally in flouting. That's an exacerbating factor, Your Honor. I agree. The issue is — Although, I don't know if it's undisputed. I mean, the timing of the — There's no question. There is no question that he put in the order before he was allegedly contacted. The administrative law judge did sort of a ready-fire aim. And in the appeal to the commission, it was clarified that, in fact, the orders with their time stamps were before any alleged phone calls. What do you mean, alleged? Well, I — There was no testimony as to when the phone call was made. Allegations are in complaints. Pages between 6 and 13 and 32 and 37 of our opening brief lay out the facts relating to the communications. It is our position that the evidence — the weight of the evidence is not in favor of Mr. Kirkham having communicated with Petitioner. The scope of our review on such an evidentiary question? The scope of the — it's the weight of the evidence. Do we re-weigh the evidence at the appellate level? We do not simply grant deference to the fact finder unless we find an abuse of discretion. We — is it a de novo weight of evidence test? Do you know what I'm talking about? Yes, yes, yes. Yeah. So what's the answer? Yes. Your basic review? No, it's not. It's in terms of weighing the evidence. It has to — you can — your review is to determine whether or not the weight of the evidence. So we're like a trial judge in the State court. We re-weigh the evidence on a motion of new trial? No. I wouldn't go that far, but I — Well, what is the — The commission, in terms of the intentional conduct, it has to be supported by the weight of the evidence. Let me ask you this question one last time. How do we view the evidence? Do we give deference to the trial — to the examiner's findings, or do we look at the record and weigh the evidence anew, de novo? You give deference unless there's, you know, an abuse of discretion. All right? Thank you. Okay. Now, you're over time. To say it this way, you have an overage, but our sanction will not be severe. Let's hear from the government, and then we'll give you a chance to respond. I appreciate that. Thank you, Your Honor. I should say the commission. Yeah. Thank you, Your Honor. Nancy Page. I don't want to — oh, excuse me. I didn't want to identify yourself. I'm — excuse me. Your Honor, Judge Brunetti, I'm happy to hear from you. This is Nancy Page on behalf of the CFTC. But you should identify yourself for the record, though. Thank you. Nancy Page on behalf of the CFTC. I just wanted to say, in your argument somewhere, it seems to me I heard some things here in the opening argument that I didn't see in the briefs. Am I wrong? In regards to selective prosecution. I quickly checked again, and I don't see that argument anywhere. Yes, Your Honor, and to be perfectly fair to my brother, Mr. Cadden, yes and no. Yes, there has not been an affirmative oral argument regarding selective prosecution. But respectfully, there's a distinct twinge in both the opening and reply brief of appellant of an insider-outsider system, where the exchange members are cut at break. And I'm happy to — I think that that's — that in the absence of a legal framework or an assertion of a standard of law, that might be waived. But in an abundance of— I'm talking about what was done at the ALJ level and at the commission level. They didn't discuss that at all. No, Your Honor. There was a debate about the meaning of Rule 443, and our enforcement division did aggressively and successfully argue before the commission that 443 is about sanctions, that the liability provision, the thing that causes the violation is 8302. And both — and on appeal, we have also heard that perhaps there's two systems of justice here, one for members of exchanges who are subject to Rule 443, and then for traders who, with some exceptions, such as an absolute trading ban for life, are not subject to Rule 443. And as to that, let me just launch right in and state the only evidence in the record before this Court today is that there's not a dual or bifurcated system, but an extra supplemental layer of discipline that the Chicago Mercantile Exchange places upon its members and affiliates and other organizations under Rule 443. The only evidence in this case today is the testimony of a very senior disciplinary official, Eric Wolf, at the Chicago Mercantile Exchange, that they took a look. The way the rules are written, traders can only come into them for one purpose when something like this happens. They don't have the ability, as we do under our statute, for graduated penalties. They could have done an absolute trading ban on him. They thought about doing that. And the testimony of Mr. Wolf, which is on volume C of the record, on page 114, is a trading ban is considered to be among the most severe penalties possible to be issued in the industry. While we believe that Mr. Severi's conduct warranted some sanction, perhaps some significant sanction, we did not believe that it rose to the level where we would consider him denying him access to the CME's markets. And finally, as to the Rule 443 argument, my third point would be the only evidence in the record here today is that had he been a member of the exchange and subject to a system of discipline that he asserts to the Court without evidence would be leaning upon him, he states he would have just gotten a first warning, the only evidence in the record is that, in fact, that's not the case. He would have come under Rule 443. Had he been a member of the exchange and subject to this supplemental discipline structure, Rule 443, which is set forth in the record excerpts and is also the text of it appears in the Administrative Record Volume A on pages 262 and 263, state that you will be referred to the Business Conduct Committee when the violation occurs in the spot month. Your Honors, that's market parlance for the month of expiration, the month where the futures price converges to the cash price, and August for frozen portfolios was the spot month, where the violation is more than 150 percent of the speculative position limit. Here it's 186 percent. And any one of these factors is enough to trigger 443C, and he's under two of them. And the third one is where the Division of Market Regulation deems the violation to constitute a severe violation of the rules. And the only record here is Eric Wolf saying this would have been a severe violation of the rules. The reason CME did not touch him further is because they couldn't except for an absolute trading ban. And with respect to that, CME was not willing to go that far, and it's not before the Court to second-guess their decision not to do an absolute trading ban. Can I stop you there? Because you've hit right exactly where I am with 443. 443 talks about a customer trading more than one with more than one clearing member. So you're talking about a customer and a clearing member, which would be a member of the CME, right? And if there's a violation, a letter issues a letter warning to both the customer and the representative. Is that correct? That's what it says. And the violation will not record for the first occurrence of a speculative position. Then on the second, the following warning letter, it could issue a cease-and-desist order. Now, would that be to the customer or to the member or both? Your Honor, the cease-and-desist letter in this case would not go to a trader because they're not within Rule 443A. They're not a member. This process does not apply to Mr. Severi. The test of the 443B says it shall subject the violator to a cease-and-desist order. Does that mean that if a member who's dealing with a customer and the customer violates 8302, that the member is also violating 8302? Your Honor, the answer is 8302 establishes liability for the violation for it, but this entire section 443 is under Chapter 4 called Enforcement of the Rules and has jurisdictional provisions, which say they apply to members and affiliates and other persons. The only evidence in the record is that the way this broader Chapter 4 rulebook reads, the Enforcement of the Rules, what they can do to people who are outside their jurisdiction as members is simply ban them from entering the physical premises of the exchange. Although this Court has been told, and if I may, I think I know the source of it. Let me stop you right there because that was my next question. The last line of 443B is that if there exceeds a speculum after receiving the two violations, that they could actually have a hearing and say, okay, Mr. Saberi, you can't trade on our market anymore. Your Honor, no, no. And this is the point I'm eager to get to. 443A is not exclusive of applying.  There is no first-time pass, even if you're a member of the exchange. The first language of Rule 443 says the BCC may take other actions or impose additional testimonies. And Eric Wolf, who has for decades applied this rule on the CME versions of it, states on the administrative record on Volume C on page 116 that 44A is not exclusive, that it involves a first violation that's considered de minimis, but a first violation that is threatening or triggers any of the 443C things would the first time be brought under Rule 443C. Rule, it says, he was asked this question, but with respect to the de minimis aspects of the rule violation, are there published criteria by which the exchange identifies or indicates which violations they'll consider only de minimis? And Mr. Wolf's answer is, no, but the inverse. When Rule 443 sets forth those types of violations which are considered more serious by the exchange, and those would be handled by a different path than Rule 443A. In this case, he would not have gotten just a warning letter if he were a member of an exchange. And, in fact, the letter he did receive from the exchange, the record evidence is that wasn't a warning letter. The letters that you have on your record of excerpts on pages 53 to 57 are, you violated these spec limits and we're thinking about sending you to the Business Conduct Committee, where, again, the only jurisdiction they'd have would be a physical ban from the premises of the market. And the next letter he gets is, we're closing this out and referring it on to the CFTC. In effect, I don't want to say he got a pass, a break from the exchange, but they didn't go as far as they could because the only thing they could do was push that ban button and they decided no, they'd pass it to the CFTC, where we took, I respectfully submit, a more graduated and measured approach appropriate to a one-day spec limit violation. Kennedy, is your position that Mr. Wolff thinks that these circumstances would have given him more than a 44A first warning letter? Is that based on the factual finding that he bought ten contracts after he got a warning? No, Your Honor, and in fact Do you agree with Mr. Cadden that it is undisputed that the warning from Dean Witter at 8.13 a.m. came some 24 minutes after the trade had been placed in Chicago for the additional ten contracts for pork bellies? Yes or no? I was just going to ask for the Court's indulgence. I would have to say very close to no. We'll never know for sure, but for purposes of this appeal, no, Your Honor, and we're willing to be bound for no. Let me just go over some facts with you. Your Honor, for purposes of this appeal, no, what we would emphasize is not the timing of the phone calls here, which, for purposes of this appeal, again, I won't waste the Court's time. We'll assume for purposes of this appeal that the phone call happened, the longer phone call, not the 20-second or 10-second phone call, happened. Mr. Kirkham describes the conversation as very brief, so it could have been that. We'll never know. Let's assume he put those things in. Why will we never know? Let's take a look at the record. The declaration of Thomas Sandy says that at approximately 949 CST, that would be 749 PST, on the morning of August 14, Saberi entered a telephone call for 10 short August 2000 frozen pork belly contracts, and that was executed at 952. The testimony of Saberi's broker, who gave him the notice, that is, Dean Witter, was quote, between 8 and 830 PST, and Dean Witter's phone bill shows a two-tenths-of-a-minute call at 813 and a nine-tenths-of-a-minute call at 924. Even if it had been at 813, it would have been more than 20 minutes after he'd made his contract. Do you disagree with those facts? And if so, give me the ---- No, Your Honor, I do not. You do not? No, I do not. You admit those facts, right? I admit those facts. Well, then, isn't it the trial, the administrative law judge's decision that he intentionally violated the excess holding agreements wrong on the way to the evidence? The commission's decision. The commission's decision. The commission's decision looked at a two-tenths-of-a-minute phone call. This just ---- I beg the Court's indulgence. Mr. Kirkham said it was brief. He said ---- They got their times wrong. They just thought everything was Pacific Standard Time. They forgot there's a two-hour difference between Chicago and San Francisco. Isn't it as simple as that? In terms of whether the information Mr. Kirkham's contemporaries note said could have occurred in two-tenths-of-a-minute. Well, wait a minute. We're way off here. The commission straightened it out in footnote 10 of page 8 and just flat out said the ALJ was wrong. We're arguing about nothing here because the facts are the facts. We have chosen ---- the commission has said we're going to look at this and say that aspect of the ALJ's decision is flat-out wrong. Because the facts were there. And so that ---- so you go to a different issue on scienter or intent on the sanction side. And what we would emphasize with regard, Judge Bail, with regard to the 10 contracts is not the timing of the phone call. So you guys, may I just respectfully, you're trying to pull a concession out of me. I'm volunteering to the Court here on the timing. I'm just trying to be clear. You're throwing the concession at us. I concede, I concede. I don't want a concession. I just want you to tell me what you're saying. I'm telling you what the commission said. And the reason why is that we have a wealth of other evidence here. And even with regard to the 10 contracts, if I may, Judge Bail, let's think about this, that 50 contracts were already at that at Dean Witter. Here we have an experienced trader with over decades of experience, the trading records show, trading constantly, daily in various markets nationwide, who claims not to know about the linchpin of our system on speculated position limits, claims not to know even a year later after this starts. And it is he chooses to buy the 10 contracts on the man account when he's already at 50 at Dean Witter. The fact is, this market system, this Court can see just from this fact record, has multiple layers of surveillance. And if you evade the FCM layer, the Dean Witter layer, because you stop at 50, what's interesting about the date, August 14th, is he bought the 10 more at man. And, Judge Bail, what the record is also absolutely uncontradictable on is that after he bought those 10 contracts, the market was still open. That call did come in later that day. And he didn't sell out. And he did not liquidate. And he did not liquidate. But you're saying to me that the commission found that the ALJ was wrong as to the timing? Yes, Your Honor. I'm looking at page 4 of the commission's ruling. Page 8, footnote 10. And I must be looking at something different, because page 8, footnote 10. Yes, footnote 10 on page 8. All right. Go ahead with your argument. Thank you, Your Honor. The ‑‑ what I wanted to say about Sienter, and I think this is important for the Court to know regarding the, if I may just step back, the workings of our market. We talk about phone calls and timings. One of the things to step back and realize is these speculative position limits are very well known. They're the linchpin. Before my agency was created, Congress was through an intermediary setting these limits. When the CFTC was created in 1975 and given this power, these are well-publicized rules. And the reason why these are important and critical rules to avoid market manipulation are set forth in some detail in In Re Volume Investors and in the Hunt case. And, in fact, Congress was very clear on this. In Hunt, they said there's a site to legislative history that says, regarding the commission originally getting the power, that transgressing these spec limits will be a violation of the statute, quote, regardless of how or when or for what purpose such position was created. Such an absolute per se violation rule is no center required for a non-criminal violation. Am I correct in reading the record from the commission's opinion and from the record that the Dean Witter representative made the phone call, and it was after the man transaction, and he was following the instructions given to him by the CME official, and that was, tell your clients he's over 50 and it applies to all accounts? And, Your Honor, not only would you be able to do that, but it would also be a violation of the statute. And that was a directive from the regulator to the broker saying, you tell him, over 50 and it applies to all accounts. Yes, yes, Your Honor, that is the record, I apologize, and the record excerpts on page 71 show Mr. Kirkheim saying that he took contemporaneous notes because he knew this would be important. The record excerpts of Appellant on page 41 has the word total in capitals, that he told him total in capitals. Mr. Kirkheim said that this had never happened to him before, that this was unusual and he knew it was serious. And that's very interesting, because when we talk about these position limits being the linchpin, and we heard evidence that this rarely happens, it rarely happens for a reason. I argue the same facts Mr. Cadden does to a different conclusion. There is a reason people don't transgress the spec limits in our position markets, and you see it on this record. We are aggressive on it. We have multiple layers of protection. We have to. These markets are very illiquid. You should not analogize to the equities market. This can be very illiquid, especially in the ex ---- thank you, Your Honor, especially in the expiration month, which is what this was. And that's why you see graduated limitations on spec limits. For these markets to function well, not just market manipulation, but just orderly liquidation, when no one is trying to get a leg up, you have to follow the spec limits, because at the end of the expiration month, the futures and the cash price have to converge. And how that landing occurs is critical to VAPIA, even in fair playing field. And experienced traders know this. It's bread and butter. Kennedy. So your point is the intentional nature, as the commission said, the intentional nature of Severi's violation is not the question about when he got the phone call, but that after getting the phone call and during the day, instead of covering his shorts, he wrote it down. Yes. He did ---- he does concede he got the phone call, and he ---- and then he didn't liquidate. The second reason why is the experience of Mr. Severi. And the third reason why, and we've emphasized this in our brief, and maybe my parting words to the Court here today, do not overlook the words of Mr. Severi himself in testimony as to why you should believe this is intentional. Even a year later, he says he doesn't know what a position limit is. He says in his investigative testimony on administrative record volume B at page 113, I wish you guys would have called when I was losing money, but you never call. I lost half a million bucks once and never got a call. You guys only call when a guy is making money. He knows about these spec limit calls. He speaks of them in the plural. He resents the fact that he's being asked to move out of the market for market  Thank you, Your Honor. Thank you. Mr. Cadner, would you like a minute? Yes, Your Honor. I'd like to just hit a couple of points very quickly. The first one is, and I think this is designed to kind of bring back a little bit of the definition of 443, counsel for the commission has stated that somehow 443 doesn't apply to public customers. It only applies to members of the exchange. And that simply is not the case. The linchpin to the commission's system of exchange speculative limits is a delegation. The exchanges are required to adopt the rules and enforce the rules. The sine qua non of self-regulation is that it has to apply to everybody. There's nothing in the rules or in the statute or in the rulemaking that says that these rules only relate to members and that they don't relate to the public. Of course they do. And in fact You're over your minute. If you'd like to wrap up, that would be great. In fact, they have to. Otherwise, the whole system would fall apart. Thank both of you for your useful argument. The case of Siberia versus Commodities Futures Futures Trading Commission has now submitted for argument. We're in adjournment until tomorrow morning.
judges: Brunetti, W. Fletcher, Bea